BRENNAN v. O'BRIEN.

121   491
126   165

121   491
s80ᴺᵂ 249
121   491
s80ᴺᵂ 249
131   617
121   491
139  ³ 21

1. NEW TRIAL—DISCRETION OF TRIAL JUDGE—REVIEW.
   While the Supreme Court is warranted by the provisions of Act No. 134, Pub. Acts 1893, in reviewing the discretion of the trial judge in refusing a new trial, asked on the ground that the verdict is against the weight of evidence, it will not ordinarily, after he has seen the witnesses, heard the testimony, and given careful consideration to the motion, interfere with his conclusions.

2. JURORS—QUALIFICATION—ACQUAINTANCE WITH PARTIES.
   That a person summoned as a juror has a general social acquaintance with one of the parties to a cause, and for that reason prefers not to sit, is not ground for excusing him, where he declares that, should he sit, he can and will render a verdict according to the evidence.

3. SAME—HARMLESS ERROR.
   A judgment will not be reversed because the court excused a qualified juror who was acceptable to appellant, where it does not appear that appellant exhausted his peremptory challenges, that talesmen had to be summoned, or that he was otherwise prejudiced.

Error to Wayne; Hosmer, J. Submitted June 9, 1899. Decided October 3, 1899.

Case by William Brennan against Patrick B. O'Brien for false imprisonment. From a judgment for plaintiff, defendant brings error. Affirmed.

*Keena & Lightner*, for appellant.

*W. E. Baubie*, for appellee.

LONG, J. This is an action on the case for an alleged illegal arrest and imprisonment. It appears that the defendant is a member of the firm of O'Brien & Co., which carries on a grocery business in Detroit. Plaintiff was employed in defendant's store. On November 18, 1897,

Mr. Gibbs, the cigar man in the store, went to the staircase to get his coat. This staircase leads to the cellar, and is entirely closed, except at the entrance, and is dark, except when the electric lights are turned on. Gibbs had hung his coat there in the morning, and not finding it at noon, and presuming that one of the employés had taken it in sport, he asked each of them, on their return, about it. He was informed that the plaintiff had left a coat in the cellar; that he had not gone out the front door to dinner, as usual; and that he had returned through the rear door. Gibbs asked him about his coat. Plaintiff denied that he knew anything about it. Gibbs told the defendant about it, and stated that he thought plaintiff must know about it. Defendant asked plaintiff about the coat, and he denied to him that he had any knowledge of it. Defendant then sent Gibbs to the police station for a detective to investigate the matter. Detective Baker returned with Gibbs, and defendant told Baker that plaintiff was the person suspected. Plaintiff, defendant, and Baker then had a conversation about the matter. Their versions in regard to this differ. Plaintiff testified:

"As the detective came in, O'Brien said, 'There is the fellow that stole that coat; take him away.' Mr. Baker walked up to me and put his hand on my shoulder, and told me I was under arrest. He says, 'You are under arrest,' and he opened his coat, and his badge was there; and I asked him if I could go downstairs and put on my coat. I went down. He says, 'Come on; I will take you down.'"

The plaintiff further testified that, after going into the cellar, the defendant asked: "What did you have for dinner today?" That he told him, and then the defendant said: "Where did you get it?" That he told him his mother-in-law helped him through, when the defendant said to the officer: "He is married. He gets three dollars per week. How can he live if he don't steal?" The plaintiff then testified:

"Mr. O'Brien told the officer to take me away. The

detective pulled back his coat, and in his hip pocket he had handcuffs; and he told me that, if I would go peaceably on, he would not put them on me."

Plaintiff then detailed the walk through the different streets with the detective, and stated that, in going, the officer stopped in two or three different pawn-shops, and asked "if this fellow had pawned a coat there;" that the officer would put his hand on his shoulder and say, "We will go in here;" that they went to plaintiff's house, which the officer searched, and then returned to the store, where the officer left him, saying, "That will be all for you now." Plaintiff further testified that he worked in the store for a few days after this, when the detective came in and said to O'Brien, "We have got the man who took that coat;" and that O'Brien, turning to plaintiff, said, "You can go to work now, and everything will blow over in a few days." Plaintiff further testified that he quit work a few days thereafter because the men in the store laughed at and made it uncomfortable for him; that he tried to find work thereafter, and could not for about six months; that he tried to find work, but on each occasion he was asked where he worked last, and what he left his work there for, and when he stated the reason he could not get employment.

The defendant and the detective both testified that at no time did the detective lay hands on the plaintiff, nor did he tell him he was under arrest, and that defendant did not ask or instruct the detective to arrest him. They further testified that the detective went to plaintiff's house at his suggestion, to prove to them that he did not have the coat.

The court charged the jury in part:

"It is claimed on behalf of the defense that there was no arrest, and to that I think Mr. O'Brien testifies, and the officer, Mr. Baker, and those parties in the store, who had an opportunity to see at least a part of the occurrence there. It is for you to say from this evidence which has been offered in this case whether the plaintiff was or was

not arrested. If he was arrested, he is entitled to recover such damages as will compensate him. If he was not arrested, obviously the defendant is entitled to your verdict; and I charge you as requested by the defendant: 'If the jury find from the evidence that the plaintiff was not arrested by Detective Baker on November 18, 1897, your verdict would be for the defendant. And, unless the plaintiff was deprived of his liberty by Detective Baker, there was no arrest, and the verdict will be for defendant.'"

After verdict in favor of plaintiff for $500, the defendant moved for a new trial. This was refused, and many of the assignments of error are based upon that refusal.

1. It is first contended that the motion should have been granted for the reason that the verdict was against the great weight of evidence. It is conceded that this court will not usually review the discretion of the trial court in refusing to grant a motion for a new trial; but counsel urge that the present case is one which should move this court to interfere, under the provisions of Act No. 134, Pub. Acts 1893, which provides for "incorporating the record of proceedings had on motions for new trial in bills of exceptions." The statute is undoubtedly broad enough in its terms to warrant the interference of this court on appeal here, but we do not think the present case presents such a state of facts that we should overturn the deliberate conclusions of the circuit judge. It is true that the plaintiff was contradicted in many essential particulars in reference to the question whether an arrest was actually made. The plaintiff's story was listened to by the jury, and they found, under the charge, that the plaintiff was arrested. The circuit judge also saw the witnesses, heard their testimony, and, after a careful consideration of the case, refused the motion. No showing is made which convinces us that the court did not act properly in refusing the motion.

2. The defendant took exception to the ruling of the court in excusing two jurors who he claims were qualified to sit, and who were satisfactory to the defendant. It appears that plaintiff had exhausted his peremptory chal-

lenges, when Mr. Beck was called as a juror.   His examination took place as follows:

"*Q.* How long have you known Mr. O'Brien?

"*A.* Some years; I don't know just how long he has been on Woodward avenue.

"*Q.* Do you know him intimately?

"*A.* No, sir.

"*Q.* Have you done business with him?

"*A.* I have done some business with him in the store,— just purchasing, and paying for what I got.

"*Q.* Just the same as you would do in any other store?

"*A.* The same as I would do in any other store.

"*Q.* And it was not a question of meeting him there; it was the meeting of anybody that happened to serve you?

"*A.* Yes; that is all.

"*Q.* Do you know Detective Baker?

"*A.* I am acquainted with him.

"*Q.* How long have you known him?

"*A.* I could not say definitely.   I have known him as a detective.

"*Q.* Are you on speaking terms with him?

"*A.* Yes; say 'Hello;' that is all.

"*Q.* Do you think that in a case where the detective had made an arrest, and his evidence might possibly contradict the plaintiff, that you would be unbiased in rendering a verdict in this case?

"*A.* The question of the detective's testimony would not cut any more figure than any one else.

"*Q.* You feel, then, as though you were prepared to go on with this case and try it impartially, Mr. Beck, without any favors to any one?

"*A.* So far as Detective Baker is concerned, yes, sir.

"*Q.* Well, so far as Mr. O'Brien is concerned?

"*A.* Well, my relations, of course, with Mr. O'Brien, have always been very friendly.   His brother, also, I know very well.

"*Q.* You know them very well, do you not?

"*A.* Well, quite well.

"*Q.* Wouldn't you rather not sit in this case?

"*A.* I would rather not sit, under the circumstances.

"*Q.* Don't you think it would be rather unpleasant for you to render a verdict against Mr. O'Brien in this case, if the evidence showed that he was guilty of the charge made here?

"*A.* If he were guilty, I would render a verdict.

"*Q.* Would you rather not sit in this case, knowing Mr. O'Brien as well as you do?

"*A.* Under the circumstances, yes, sir.

"*The Court:* You may be excused, Mr. Beck.

"*Mr. Lightner:* I would like to ask Mr. Beck some questions before he is dismissed.

"*The Court:* You may make your record.

"*Mr. Lightner:* Mr. Beck, what, in general, is the character of your relations with Mr. O'Brien; that is, other than knowing him in a social way?

"*A.* No other relations; no.

"*Q.* Now, would your relations with Mr. O'Brien be such that you could not fairly listen to the evidence, and give a verdict in accordance with the evidence and the instructions to the jury?

"*A.* I would give a verdict in accordance with the evidence, certainly.

"*The Court:* Mr. Beck, you may do as you please about it. If you feel, under the circumstances, you prefer not to sit, you may do as you please. Under the evidence, I do not think there is any legal reason for disqualification shown.

"*Mr. Baubie:* I think, under the circumstances, if I had another peremptory challenge I would excuse Mr. Beck, more on account of himself than anything else.

"*The Court:* He may be excused on his own motion, if he desires.

"*Mr. Beck:* All right, sir.

"*Mr. Lightner:* I will ask for an exception. I understand the counsel has exhausted his challenges, there is no challenge for cause, and that your honor does not excuse Mr. Beck,—you simply give him the privilege under my objection.

"*The Court:* Yes. Call another juror. Note an exception."

About the same facts apply to the juror Salliotte, who was also excused by the court.

While it is conceded by counsel that the court may excuse a juror when it has some reason for so doing, yet it is insisted here that the court, without any reason whatever, permitted these jurors to excuse themselves; that by this course the court, after plaintiff had exhausted his challenges, deprived the defendant of an equal chance of

securing an impartial jury; that defendant at that time had exhausted three of his challenges, and could exercise only one more. On the other hand, it is contended by counsel for plaintiff that the examination of these jurors disclosed that they were not qualified to sit. We find nothing in the answers of the jurors to the questions put to them that in any manner disqualified them as jurors. It is true that in *Welch* v. *Publishing Co.*, 83 Mich. 661 (11 L. R. A. 233, 21 Am. St. Rep. 629), it was held to be error where the court excused a juror who was qualified to sit, but it there appeared that the regular panel had been exhausted and talesmen were drawn in place. It was shown that the plaintiff was prejudiced by the action of the court in excusing the juror. In the present case the defendant had not exhausted his peremptory challenges, and it does not appear that the panel of regular jurors had been exhausted. Under such circumstances, we cannot say that the defendant was prejudiced in any of his rights. In *Luebe* v. *Thorpe*, 94 Mich. 271, it appeared that the court excused a juror because he was over 60 years of age. This was held to be no ground of challenge for cause, and yet it was said:

"It does not follow, however, that the act of the circuit judge in excusing the juror was prejudicial to the defendant. It does not appear that there were not remaining a sufficient number of jurors of the regular panel to form a jury to try this case; nor does it appear that the defendant had any ground of objection to any of those who actually sat in the case, or that she had exhaused her peremptory challenges."

The reason for this holding is fully set out in *Atlas Mining Co.* v. *Johnston*, 23 Mich. 39, which is quoted from at some length in *Luebe* v. *Thorpe*.

We are of the opinion that no prejudicial error is shown in the present case. The judgment must be affirmed.

The other Justices concurred.