WHITE *v.* COWING.

1. JURY—CHALLENGE FOR CAUSE—FRIENDSHIP FOR PARTY—IMPARTIALITY.

That a juror had a general acquaintance with, and expressed friendship for, one of the parties, was not ground for challenge for cause, where it appeared that he could and would try the case impartially, "although it would make it harder" for him.

2. MASTER AND SERVANT—INFANTS — PERSONAL INJURIES — NEGLIGENCE—QUESTION FOR JURY.

In an action for the loss of a foot by a boy nine years of

age who was employed by defendant to drive chickens out of the grass in front of a mowing machine, the court below properly refused to instruct the jury, as requested by plaintiff, that defendant was guilty of negligence in the manner indicated therein, where, under the evidence, the question was one for the jury.

3. TRIAL—INSTRUCTIONS—REQUESTS TO CHARGE.
    Where the substance of a requested instruction was given by the court in its general charge, it was not error to refuse the request.

4. SAME.
    In determining whether a case was properly submitted to the jury, the charge should be construed together as a whole.

5. SAME—ISSUES—INSTRUCTIONS.
    In an action for personal injuries to an infant nine years of age, where the age of the boy, his negligence, if any, and his opportunity to observe obvious danger, were all dwelt upon by the court, in his charge to the jury, as was the claimed negligence of the defendant, *held*, the case was properly presented to the jury.[1]

Error to Jackson; Parkinson, J. Submitted January 14, 1919. (Docket No. 35.) Decided April 3, 1919.

Case by Albert G. White, an infant, by his next friend, against Lizzie Allen Cowing for personal injuries. Judgment for defendant. Plaintiff brings error. Affirmed.

*Price & Whiting*, for appellant.

*W. S. Cobb*, for appellee.

STONE, J. The plaintiff, on July 22, 1913, when he was nine years and three or four months old, lost his left foot by coming in contact with a mowing machine driven by the defendant, and this action was brought to recover damages for such injury. The plaintiff's parents lived in a tenant house on the farm known

[1] See notes in 17 L. R. A. 79; L. R. A. 1917F, 10.

as the "Allen farm," and plaintiff's father worked
for defendant's sons, who worked the farm and lived
with defendant on the farm. Plaintiff was born in
England, and came to this country with his parents
about two years before the injury, and plaintiff's fam-
ily moved onto the farm about three months before
the injury. Plaintiff testified on the trial that he had
had no experience with mowers, and did not under-
stand the manner in which grass was cut by a mower,
although he saw the grass fall; and that he had never
seen a mowing machine work before they went to the
Allen farm. The defendant's sons had a piece of al-
falfa to cut, and she, assisting them, was driving the
mower herself. They had a large number of chickens,
and the coops were in and near one corner of the
field, and as plaintiff's brother, Arthur, who was four
years older, was passing the defendant's house in the
morning, defendant spoke to him, and asked him if
he would ask the plaintiff to come down and drive
the chickens out of the grass, while she was mowing.
Arthur told the plaintiff as requested, and he went im-
mediately down into the field. When he reached the
field where the defendant was mowing, he described
in his testimony what occurred as follows:

"The chickens were right in the edge of the field.
There were coops there, and there were a good many
chickens. They were about five or six weeks old. When
I went down there to the field, she told me she wanted
me to keep the chickens away from in front of the
mower. She didn't say anything else to me. She
didn't give me any caution or warning about the
mower, about getting in the way of it."

After testifying to his inexperience with mowers,
he continued:

"The chickens were just on one side of the field, and
when she went around two or three times I started to
keep the chickens away again where they were, and I

seen a frog, and I started after him, and I stepped right in front of the knives. The chickens were on one side of the field in which she was mowing—the north side. When I was cut she was going north.

"*The Court:* May I ask a question here? Were these mower knives, the cutting part of the machine, on the right side of the machine or on the left side?

"*A.* On the right side.

"*Q.* Then as she was going north she was on the west side of the field?

"*A.* Yes.

"*Q.* And the knives were to the right, or east side of where she sat?

"*A.* Yes.

"*Q.* Were you on the west side of the field?

"*A.* Yes. The coops where the chickens were, were kind of at the northwest corner of the field. I wasn't very far from the corner.

"*Q.* What had you done the other two times she had gone around in the way of driving those chickens. What did you do, or how did you keep them out?

"*A.* I got in the grass and drove them back.

"*Q.* When you started after the frog, how many steps did you take before you got your foot cut?

"*A.* About three. These steps were taken all one way. The machine was about four rods from me when I started after the frog.

"*Q.* Did she come that four rods while you were taking three steps?

"*A.* Yes. I was reaching down all the time to get the frog.

"*Q.* What?

"*A.* Yes, because I was reaching down all the time to try and catch the frog.

"*Q.* You were reaching down. Did the frog keep straight ahead all the time?

"*A.* Went right straight one way.

"*Q.* What I want to get at here is whether—you say you were reaching down—did the frog go straight ahead after you started after him, or did he jump zigzag?

"*A.* First one and then the other. He didn't jump straight ahead. Kind of went one way and then the

other, then kind of straight; kept going straight, not all the time, first one way and then the other.

"*The Court:* If you grabbed for him, he dodged from you, didn't he?

"*A.* Yes.

"*Q.* Then you would go for him and miss him again?

"*A.* Yes.

"*Q.* How many times did that happen to you while you were after him?

"*A.* About two or three times.

"*Q.* As she came along with the team, were you facing her, or was she coming behind you or to the side of you?

"*A.* Coming kind of one side of me. The frog went west. The lane was on the north side of this field, and the team was going towards the lane.

"*Q.* Which way was the frog going, toward the lane or away from it, or parallel with the lane? Which way was it the frog jumped?

"*A.* Going west—the frog was. * * * He kept going off one side, then the other, but he was kind of going west all the time. He was going toward the cut alfalfa. I was out in the uncut alfalfa. The frog had not got out of the standing alfalfa when I got hurt. The last time I dove after the frog I moved a step or two. I was going towards the west.

"*Q.* Towards the west. Going right straight toward the machine that was coming up against you?

"*A.* Yes. It was the left foot that was cut.

"*Q.* Which side was nearest the machine, which foot, as you were after that frog the last time?

"*A.* The right foot was.

"*Q.* How did you get your left foot cut, then?

"*A.* I thought you meant which foot was nearest the knives before the other one got cut.

"*Q.* No. At the time you dove after that frog the last time, you say you took a step or two. Which foot was next to the machine, the way the machine was going, closest to the machine?

"*The Court:* Do you remember which way you were facing? You would know then how to answer it.

"*A.* My left foot. I was facing west. * * *

"*The Court:* The knives were on the east side and he was going west, and his left foot was nearest the

knives. You were going toward the west, were you, chasing the frog?

"*A*. Yes.

"*Q*: How far away from where the machine would have cut its swath would you have been, if you had remained out there and hadn't started after the frog? Would the knives have come very close to you?

"*A*. Yes.

"*Q*. This is what I mean: We will say this is the alfalfa (illustrating); here are the horses and the knives right back that way and cutting a swath right along. You were out in the alfalfa to the west; you took after the frog. Would the knives have gone by without hitting you if you hadn't taken after the frog, if you had stood still where you were when you first went after the frog, would the cutter bar have gone by you without hitting you? * * *

"*A*. Maybe it would just went by. I couldn't say.

"*Q*. Would it have hurt you at all if you hadn't been following the frog west, do you think?

"*A*. It might have went by me. The last time the frog jumped was toward the west.

"*Q*. What direction did it jump in before that, the last time before that, if you recall?

"*A*. Jumping toward the west.

"*Q*. Was it jumping toward the west all the time? Then it didn't jump first one way and then the other, as you said awhile ago?

"*A*. It was going towards the west, but then it didn't go exactly straight. My foot was cut just above the ankle. It was left just hanging a little bit, was all. I have an artificial foot now. * * * Mrs. Cowing was driving two horses. There was no one else in the field when it happened, but the defendant and myself. I couldn't say for sure whether she had mowed any in the field before I went down there, or whether I was there the first time round."

The foregoing is substantially all of the testimony of the plaintiff, upon the subject of the injury, on direct examination.

The record shows that the plaintiff was a large boy of his age, and, as shown by his testimony, was in no respect deficient mentally, but a bright and active

boy. Upon cross-examination the plaintiff testified that while he did not realize there was any danger from the machine, yet that he saw the grass fall, and knew that if the chickens got in the way they would be injured; that he never stopped to think whether the machine would hurt him; that plaintiff and his family continued to live upon the Allen farm until a year from the next March or April after the injury, during which time there was no talk about suing the defendant. It appears that the instant suit was commenced on November 1, 1915. The following occurred on his cross-examination:

"Q. You were not paying any attention to anything else except the frog were you?

"A. Just simply trying to catch him, was all.

"Q. I say you were not paying any attention to anything else except trying to catch the frog, isn't that true?

"A. Yes.

"Q. Do you want to say anything more?

"A. No. * * *

"Q. What do you mean by saying on direct examination the team was four rods away from you?

"A. They were back four rods when I started to catch the frog.

"Q. Then the team had traveled four rods from the time you started to catch the frog before you were cut?

"A. Yes.

"Q. Did you notice the team at all after you saw it four rods away before you were cut?

"A. No, never noticed them. * * *

"Q. You were not driving chickens out when you got cut, were you?

"A. No.

"Q. How long before you got cut had you driven any chickens out of the grass?

"A. I was driving chickens out of the grass and I happened to see the frog, and I started for the frog."

The defendant testified, in substance, that she sent

for the plaintiff, as already appears, and that when he came into the field there were no chickens in the grass, and that she said: "Well, Bert, you need not have come because the chickens are not here." She testified that they conversed, and that the plaintiff followed her around the field, and that they stopped near a big tree, and as she came around the next time she stopped the team, and that the plaintiff then told her that a boy named Hoisington was making lots of money catching frogs.

"I said, 'Is that so?' He says, 'Yes, he gets 20 cents for small ones and 25 cents for big ones.' Well, that was all there was. After a few minutes I started around. He didn't follow me that time, and when I came around last I saw he had left the shade of the tree and gone out into the grass, and I can't tell, I think it must have been four or five cutter bars away, 6 foot out; he was all of 25 feet or more out in the grass, but farther than that away ahead of me, and I spoke to him, I says, 'Have you found one already, Bert?' and he said 'Yup,' and at that time he was facing the southeast or facing that way (indicating), bent, looking into the grass, and as I approached this tree I saw him off here (indicating). Of course, as I gradually came up he was in this direction; as I came along it brought me out more even with him. I got the machine—then I drove up around the tree; I had to make a turn to keep the wheel, my line—the swath was on a line. I didn't have to turn but a very little, but my attention was directed to keeping the wheel from the tree.

"*The Court:* You passed around to the east of the tree?

"*A.* To the east of the tree. The left wheel was next to the tree, but my attention was directed in guiding my team so that the wheel didn't strike the tree; that attracted my attention. When I had swung right around and was straight again, I turned, and there was that child.

"*Q.* Did you see him after you commenced to turn your team around the tree, until you saw him there in the knives?

"*A.* No, I didn't see him because the time was short. I says, 'Why, Bert, Bert!' I could not have it, and the child never made a sound, never a sound.".

She then described the manner in which she cared for the child, and getting him to the house.

In impanelling the jury the following transpired: Milton J. French was called as a juror, sworn as to his competency, and said:

"Examination by Mr. Price: I heard of the case before, about the time it occurred. I live about a mile from the farm on the same road. I can't say I heard it discussed. I heard about it. I couldn't say now who I heard talk about it. It has been too long. I have a speaking acquaintance with the Allen boys (defendant's sons) and with Mrs. Cowing. Have known them about as long as the Allen boys have been in the neighborhood. I don't know just how long that is. I have always lived in the neighborhood, and the Merriman farm has always been there. I met the defendant and her boys in a business way. Never exchanged work with them, but met them in a business way. The Allen boys live on the farm down there, I suppose. Our relations are friendly. I never heard either of them or the defendant mention this matter at all. I never heard the case discussed by either one of the parties connected with it.

"*Q.* Is there anything about the case or your acquaintance with the parties, Mr. French, that would make it embarrassing for you to sit in this case?

"*A.* Why, personally, I had rather be excused.

"*Q.* You feel you would be somewhat embarrassed, do you?

"*A.* I can't say. Of course, looking at the matter now, I might not be. I can't tell what testimony might maybe be brought up.

"*Q.* You have some impression now, have you, in regard to the case, Mr. French?

"*A.* I can't say I have. I simply heard the circumstances spoken of.

"*Q.* You heard it discussed sufficiently so it gave you some impression in regard to the merits of the case?

"*A.* Why, I don't know as I could answer that by yes or no.

"*Q.* I took that from your answer. You didn't know what testimony might be brought up?

"*A.* Of course, my acquaintance is largely with Mrs. Cowing and the boys. The parties that were injured I have no acquaintance with whatever. With such understanding, I might be considered an interested person.

"*Q.* You would start in the case, in the consideration of it, with that friendly feeling towards the defendant and her sons?

"*A.* I certainly would.

"*Q.* That might have some weight with you in case it was a close question?

"*A.* I think it would be a great deal harder for me to sit in such a case.

"*Q.* Because of your friendship to them?

"*A.* Yes, sir, and render an honest verdict.

"*Q.* You don't feel entirely certain then, you could approach consideration of the case with a mind entirely unprejudiced and uninfluenced?

"*A.* I think I could, as far as that is concerned.

"*Q.* What do you mean by saying it would make it harder for you than if you didn't have any acquaintance with the defendant and her sons? What would make it harder for you to sit in the case? What is there about it that would make it difficult and hard for you?

"*A.* Well, in case a verdict should be rendered for the defendant, why, friendship—rather, for the plaintiff—friendship with the Allen boys would make it harder for me to try and render such a verdict.

"*Q.* So you wouldn't feel as free to bring in a verdict against the boys as you would if you didn't have that acquaintance?

"*A.* I don't think I should.

"*Q.* Then it would necessarily influence you, or it might, in the consideration of the case, wouldn't it?

"*A.* There would be a tendency.

"*Mr. Price:* I challenge him for cause.

"Examination by Mr. Cobb: *Q.* Mr. French, the court would, of course, instruct you, as well as the other jurors, that no verdict should be based upon

sympathy, prejudice or friendship for either of the parties, that such a thing as that should not influence you one way or the other. Now, with that understanding, I want to know whether or not you could, in your judgment, sit as a juror in the trial of this case, listen to the testimony and render a verdict uninfluenced by any such consideration?

"*A.* I could, yes.

"*Q.* Would you, if you sat as a juror?

"*A.* I certainly would.

"Examination by Mr. Price: *Q.* Nothing which the court might say in his instructions would remove the feeling of friendship which you have towards the defendant and her boys?

"*A.* It wouldn't remove my friendship.

"*Q.* Or make it any easier for you to render a verdict against them?

"*A.* I don't think so.

"*Q.* That would be a thing you would have to overcome, no matter what the court said to you?

"*A.* Yes, sir.

"*Q.* You feel you could do that, but still you realize that on account of your acquaintance and friendship for these people, you cannot approach the case the same as a stranger could?

"*A.* I could not.

"*Q.* It would make it more difficult for you to do justice to the plaintiff in the case?

"*A.* It would.

"*Mr. Price:*    We say the challenge is good.

"*The Court:* I understand the juror to say, notwithstanding the difficulty, he can overcome the difficulty and would not be influenced by it.  *  *  * (The Court, continuing.)    The juror has been very frank in his answers.  In his neighborhood—lives within a mile, as I understand, of the defendant, Mrs. Cowing, and would prefer not to sit in the suit.  Yet he says he can discharge his duty although it would be an unpleasant task and a hard task.  He can do it, and do it impartially.  That is what I understand you to say?

"*The Juror:* Yes, sir."

After an extended colloquy between court and counsel the court overruled the challenge, to which ruling

plaintiff's counsel took an exception, and the juror was then challenged peremptorily, the plaintiff thus using his last peremptory challenge, and the juror stood aside.

The juror that was next called was not challenged for cause, counsel for plaintiff saying, in argument, that there was no ground for a challenge for cause. The jury were then sworn to try the case, and the trial proceeded.

The plaintiff requested the court, among other things, to charge the jury as follows:

"(2) If the defendant set the plaintiff to work to keep the chickens away from in front of the mower in the uncut grass, he being at that time only nine years of age, she put him at a work which was hazardous and dangerous to life and limb for one of his years, and she was therefore guilty of negligence.

"(3) If the defendant set plaintiff to work as plaintiff testifies she did, I charge you that she was guilty of negligence.

"(4) It would be negligence on the part of anyone to set a boy of plaintiff's age and lack of experience at work keeping chickens out of the uncut grass in front of the mowing machine, without warning him of the danger of getting into the knives, or without taking precaution to prevent his being cut by the knives.

"(6) In determining whether plaintiff was so negligent as to prevent him from recovering at your hands, you must take into account his immature years, and make the due allowance for the fact that boys of his age are playful and apt to do thoughtless things. He should not be held to any greater degree of care than other boys of his age and experience, and you cannot hold him to the same degree of care that you would an adult or a person of mature years."

The court refused to give either of the foregoing requests in terms, as requested. The case was submitted to the jury in a very extended and elaborate charge, in the course of which the following language was used:

"2. This action is what is known in law as an action upon the case to recover damages for claimed negligence on the part of the defendant. Under the law no one has any right to a verdict or to maintain an action of this character unless the evidence—the greater weight of the evidence establishes two propositions, and these must both be established in the affirmative before the jury have any occasion to consider the question of damages at all.

("A. Those two propositions are, that the party seeking to recover and claiming damages must himself have been free from any negligence or carelessness which helped to bring about the injury complained of; and the second is, that the other party against whom damages are sought must have been guilty of negligence or carelessness, and that negligence must have been the sole and only cause of the injury complained of.)

"4. The burden of proving both of these propositions rests upon the plaintiff. It does not have to be made out beyond a reasonable doubt as is necessary in criminal cases to sustain a conviction. It is only necessary that it be made out to the satisfaction of the jury by a preponderance of the evidence or the greater weight of the evidence. That is, after considering all that the jury believes the evidence sustains or considering all the jury considers true in the case, the greater probabilities must be in favor of the plaintiff, or the plaintiff cannot recover.

"5. I will discuss the first proposition which the plaintiff must maintain in order to recover, and in case he does not he must fail, irrespective of any other question in the case. Was the plaintiff himself, this boy, guilty of any negligence or lack of care which he ought to have observed for his own protection, which said lack of care helped to bring about this injury to himself?

("6. Now, the diligence or care in this case must be such as children of his age, experience and knowledge should exercise for his own protection.) It is neither more nor less than that. What might be carelessness on the part of a grown person might not be carelessness on the part of a child. It depends on the circumstances, and you are the judges of those cir-

cumstances. (You take into consideration the age of this boy and his knowledge of the machine, its purpose, its use and its operation, and what it would do to him if he got in the way of it so it should come against his legs.)

("7. He should exercise the care that any child should exercise under the same circumstances, in the same place and amid the same conditions, and is required to use his diligence in proportion to his knowledge of what might happen to him if he should not pay attention and should get in the way.) You should consider what he had seen of its workings, if anything, either on this or on any other occasion, of its operation, what it was doing, what it might do if it got against him and he ran into the knives, what he knew, or in view of his age, and ability to see, understand or comprehend he should have known and understood as to what it might do to him if he came in contact with the cutting parts. He should have acted in reference to the situation as he understood and comprehended it, and if he knew that getting against those knives would result in injury to him, then he should have taken such care, with such knowledge, as one of his age and experience should take for his own protection.

"8. Consider what he was doing, the way he was doing it, why he was doing it, where he was, where the machine was, and his movements, what he knew as to the dangerous character of the machine, if anything; also her movements, that is, Mrs. Cowing's movements, what she was doing as he, the boy, perceived or should have perceived, and determine whether he was exercising that ordinary care that a boy of his age, knowledge and experience would exercise under the same or similar circumstances for his own protection.

"9. If he knew of the danger, understood it and paid no attention, allowed his mind to be wholly diverted and at a time when the machine was nearing him, moving in his direction, and carelessly ran in front of the knives and was cut by them, and in so doing was not exercising such care as the ordinary boy of his age, knowledge and experience and perception of what was evident or apparent would exercise

under the same circumstances, then this boy was himself careless and so helped to bring about the injury to himself, and in such case cannot recover, no matter whether Mrs. Cowing was also careless or not.

"10. If he knew and understood the danger to himself from coming in contact with the machine in the way he did, then he should have exercised care to keep away from it.

"11. Although you may believe the defendant, Mrs. Cowing, was negligent and that her negligence contributed to the injury of plaintiff, that is, helped to bring about that injury, nevertheless I instruct you that the plaintiff cannot recover unless he was free from negligence contributing to his injury.

"12. It matters not that you may believe the defendant's negligence was very great and the plaintiff's negligence was very slight, nevertheless, if the plaintiff's negligence, though slight and much less than that of defendant, contributed to his injury, your verdict must be not guilty.

"13. The fact that the plaintiff was requested to go to the field to keep chickens out of the grass and that pursuant to such request he did go into the field, and that except for such request plaintiff would not have been injured, will not of themselves justify you in rendering a verdict in plaintiff's favor. In other words, inviting him into the field and asking him to take care of the chickens is not the direct, immediate, proximate cause of the injury. A person might go into a field and drive chickens a month and not run into a mowing machine. The proximate cause of the injury was getting in—was the knives coming in contact with his leg, and the question is in reference to his right to recover whether he was careless in getting there and also whether she was careless in not preventing the accident.

("14. Therefore, those things must concur; his entire freedom from carelessness and her carelessness as the sole cause before there can be a recovery.)

("15. The plaintiff, the little boy, was only bound to exercise such care as a boy of his years and knowledge would ordinarily exercise under like circumstances. It is for you to say whether a boy nine years old would know what it was to get in front of

those knives and what diligence he would exercise to keep out of them. You are to consider all the circumstances attending the accident, the boy himself, his knowledge, his experience, what he knew or should have known, in determining whether he was careless and thereby aided in bringing about the injury. He should have known whatever was apparent to him which a boy of that age would understand.)

"16. I give you those instructions with reference to the boy's duty—what is incumbent upon him. Now, if he is at fault under these instructions, that is the end of the case and you do not have any occasion to consider anything else. Your verdict will then be not guilty. (But if under the evidence in this case you think the boy was exercising due care, such care as a boy of his age, knowledge and experience under those circumstances and in view of what he could see should exercise, then you would pass to the consideration of the next question,) (was Mrs. Cowing guilty of negligence which produced this injury and was it her fault and her fault only? If so, then the plaintiff has made out the two propositions necessary for him to make out and would be entitled to damages.)

"17. The defendant in this case, Mrs. Cowing, is only chargeable with the use of ordinary care. That is, she should use the care and caution that an ordinarily careful and prudent person would use or exercise in the same place and under the same or similar circumstances. You should consider all of the circumstances attending her movements and her conduct that morning. Have in mind the field, the tree, her proximity to it and the boy, and where he was and what he was doing as she saw him, and all the circumstances that will enable you to determine whether at the time of the accident or immediately preceding it she was guilty of carelessness, of not observing that due care which an ordinarily careful and prudent person would in the same place, amid the same surroundings and under the same circumstances observe.

"18. If in view of the situation and what she was doing and where she was doing it she was using the care that an ordinarily careful and prudent person, in the same situation and under the same circumstances, taking also into consideration where the boy

was and what she saw or should have seen, would exercise, then she was not guilty of negligence and is not liable.

("19. To make her liable, she must have been herself careless, and such carelessness, as I have before said, must have been the sole cause of the boy's injury.)

("20. If when she last saw the boy he was in a safe place and not where by his position or action or movements she had reason to suspect he would change his place to where he would be in danger, and at this time of seeing him it was very shortly before the accident, and her attention was directed to driving her machine around the tree and without any reason on her part to suspect he would run in front of the cutter bar, and he did so suddenly and she had no opportunity to prevent the accident to him, she should not be adjudged careless or negligent and in such event she should not be found guilty, even if the boy himself was free from negligence.)

("21. If the boy was in close proximity, where he might get in front of the machine, and it was apparent to her and she did not warn him, why, then, it might possibly be carelessness on her part according as you view the entire situation, what she did, what she was doing and anything that might engage her attention in taking care of her machine on account of her taking her machine around the tree. All these circumstances you must consider.)

("22. It has been conceded in this case that under the testimony if the boy had not taken the last step or two steps, whatever it was, to get the frog, the knives would have passed on by him. Counsel say that will be conceded. Now, he did take that last step or two steps in getting the frog. Is she to blame for that? Has her carelessness brought about that injury to the boy solely?)

"23. In reference to that—because that gets it down to a close—where you may easily understand and appreciate—taking that step or two steps—consider the age, experience and knowledge of this boy, what he knew about the machine and what it would do or didn't know about it, where she was with her team when he took the last step or two and how close, and say was

he careless to take such last step or two steps. If so, under the instructions I have given you as to the care required of a boy of his age and experience, he cannot recover without any reference to her conduct. You are to consider the entire case, all the facts and circumstances and all my instructions on that subject.

"24. If the boy did not exercise due care which I have explained to you and which it was his duty to exercise for his own safety and protection, then he cannot recover. (And if she was not negligent, or her carelessness or negligence was not the sole and only cause of the injury, then he cannot recover.) If she was careless and her carelessness or want of due care was the sole, the entire cause of the accident, then he can recover.

("25. Now, then, gentlemen, you should determine whether or not the boy has made out in his favor these two propositions, he was not careless, and that she was and her carelessness was the sole cause of the injury. If you find that is true, find those inquiries in favor of the boy, you reach the question of damages. If you do not find both of those propositions in favor of the boy, you have no occasion to consider the question of damages but should come into court and render your verdict of not guilty.) * * *

"40. Now, gentlemen, your verdict in this case will be in form either guilty or not guilty. (If you are not able to say that the boy was free from carelessness which helped to bring about his injury to himself and that she was careless and solely responsible—her carelessness is the sole cause, then you need not consider the question of damages but your verdict would be not guilty.) If you think the boy was entirely free from carelessness for which he is responsible, and that she was careless and her carelessness was the sole cause of the injury, then your verdict would be guilty and in connection with the verdict of guilty you state the damages you award."

The trial resulted in a verdict for the defendant of not guilty. The plaintiff has brought error, and the first error assigned relates to the action of the court in overruling plaintiff's challenge for cause of the

juror Milton J. French.   Error is also assigned upon
the refusal of the court to give the foregoing requests
to charge, and in charging the jury in the language
expressed in the several parentheses in the charge as
set forth.

1. It is strenuously urged by appellant's counsel
that the court erred in overruling the plaintiff's chal-
lenge of said juror, thus making it necessary for the
plaintiff to exercise his final peremptory challenge, to
remove the juror from the panel.   We have, at the
expense of tediousness, deemed it our duty to set forth
in full the examination, on oath, of the juror French.
Counsel for plaintiff quote *in extenso* from 24 Cyc.
pp. 186, 268, 278, 283 and 285; also cite the recent
case of *Peklenk* v. *Isle Royale Copper Co.*, 187 Mich.
644, where it was held by this court that an employee
of a mining company under the same general man-
agement as the defendant company, but having an
independent and separate superintendent and conduct-
ing its operations separately, was disqualified to sit
as a juror, and the language of this court is quoted to
the following effect:

"It places him in a situation which appeals to his
selfish interest, and that is a very potent factor with
the average person in controlling his actions."

Counsel for plaintiff do not insist that the ques-
tion here involved is the same as in the cited case,
but say,—

"we submit that selfishness is no more a potent factor
than friendship, depending entirely upon the circum-
stances and personal feelings of the person involved,"

—and argue that because French had expressed a
friendship for the defendant and her sons that he
was thereby disqualified.   We have considered this
matter with considerable care in connection with an
examination of our decisions.   We have said, in sub-

stance, that the fact that a person summoned as a juror has a general social acquaintance with one of the parties to a case, and for that reason prefers not to sit, is not ground for challenge, where he declares that should he sit he could and would render a verdict according to the evidence. *Brennan* v. *O'Brien*, 121 Mich. 491.

The question is really one of degree and one that appeals to the judgment of the court. In the instant case it does not appear that the juror had formed an opinion in the case, nor that plaintiff had any ground of objection to any of the jurors who finally sat in the case, but the plaintiff was obliged to exhaust his peremptory challenges in order to get rid of Mr. French. That the challenged juror had a general acquaintance with, and expressed friendship for one of the parties, was not ground for challenge for cause, where it appeared, as it did here, that he could and would try the case impartially, "although it would make it harder," for him. He had never talked with any of the parties, nor their relatives respecting the case, and had never heard the case discussed. We cannot say that the ruling of the court was erroneous.

2. The court did not err in refusing to give plaintiff's requests to charge, above set forth. We think it would have been error to have given the second, third and fourth requests, because it cannot be said, as matter of law, that the defendant was guilty of negligence in the manner there indicated. We think that the question of defendant's negligence was one for the jury to consider.

The sixth request to charge, in our opinion, was given in substance by the court in its general charge. Upon the subject of refusal to give that request counsel for plaintiff cite the following cases: *East Saginaw City R. Co.* v. *Bohn*, 27 Mich. 503; *Wright* v.

*Railway Co.*, 77 Mich. 123, and claim that the charge of the court was erroneous in the light of those cases. We have examined them with care, and are of the opinion that the refusal and the charge as given are not open to the criticism of counsel which is indulged in. In short, it may be said that the entire charge of the court correctly covered the law of the case. There is a great deal of repetition in discussing the charge of the court, which it is unnecessary for us to follow.

Upon the subject of proximate cause counsel for plaintiff cite 1 Thompson on Negligence, § 48; also §§ 51, 52, 53; *Milwaukee, etc., R. Co.* v. *Kellogg*, 94 U. S. 469; *Lane* v. *Atlantic Works*, 111 Mass. 136; also *Calliari* v. *Fisher*, 190 Mich. 56, and the language of Justice Brooke in that case. We have spoken so recently and so often upon this subject that it is hardly necessary to cite cases.

Counsel for defendant have called attention, upon the subject of proximate cause, to *Stoll* v. *Laubengayer*, 174 Mich. 701. We have frequently held that in submitting a case to the jury the charge should be construed together, as a whole. The circumstances surrounding this case and the issue between the parties made it necessary to submit the questions to the jury, and they seem to have been submitted with great care and fairness. The age of the boy, his negligence, if any, and his opportunity to observe obvious danger were all dwelt upon by the court, as was the claimed negligence of the defendant.

The following cases dealing with the subject of the contributory negligence of infant plaintiffs, we need only cite: *Ecliff* v. *Railway Co.*, 64 Mich. 196; *Henderson* v. *Railway Co.*, 116 Mich. 368; *Zoltovski* v. *Gzella*, 159 Mich. 620 (26 L. R. A. [N. S.] 435, 134 Am. St. Rep. 752) ; *Mollica* v. *Railroad Co.*, 170 Mich. 96 (L. R. A. 1917F, 118) ; *Trudell* v. *Railway Co.*, 126 Mich. 73 (53 L. R. A. 271) ; *Knickerbocker* v. *Railway Co.*, 167 Mich. 596.

An examination of the entire case satisfies us that it was carefully and fairly submitted to the jury, and the issue was made plain by the charge. Finding no reversible error in the record, the judgment of the circuit court is affirmed.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred. OSTRANDER, J., did not sit.